Matter of the Claims of JAMES H. SANDS, the MARTIN CANTINE COMPANY, THE DIAMOND MILLS PAPER COMPANY, and BYRON L. DAVIS, as Trustee of the Estate of JOSEPH B. SHEFFIELD, *v*. THE CITY OF NEW YORK, under Section 42, Chapter 724 of the Laws of 1905, as Amended by Section 9, Chapter 314 of the Laws of 1906.

(Supreme Court, Rensselaer Special Term, September, 1918.)

Condemnation proceedings — when report of commissioners making awards will be sent back to other commissions for new trial — damages.

   The report of the commissioners making awards to the owners of properties located on Esopus creek below the Ashokan dam, and which had been damaged by the diversion of water above each of said properties, considered, and the claims sent back to other commissions for a new trial.

MOTION to confirm awards made for alleged damage to real property.

Morschauser & Mack, for James H. Sands.

Howard Chipp and Severyn D. Sharp, for Cantine Company.

Spalding, McCabe & Jackson, for Diamond Mills Paper Company.

Byron L. Davis, for Sheffield estate.

William P. Burr, corporation counsel (William H. Grogan and William H. Black, of counsel), for the city of New York.

HOWARD, J. I have grouped together in this memorandum the four cases included in the above title. I have done so because all four claims were tried before the same commission and because the three Saugerties claims were tried together; also because many of the same conditions and principles apply to and affect all four claims.

These water powers are located on the Esopus creek far below the Ashokan dam built by the city of New York. The Sands property is twenty-eight miles below, the Saugerties properties thirty-three miles below. The three Saugerties mills are live, active, going, prosperous concerns; the Sands property is a ruin. Each of these properties has been damaged by the diversion of the water above. Neither of them has been destroyed; neither of them crippled. The Saugerties mills continue to run, as they ran before; the Sands property lies a desolation, as it lay before. But part of the water has been diverted from the stream and therefore the power of each of the falls is lessened.

The question is, how much damage has been done. This cannot be arrived at to a mathematical certainty; an approximation is all that can be accomplished. It is largely a matter of the exercise of sound judgment on the part of the commissioners after the facts have been duly considered.

The city contends that these Saugerties mills depended primarily for power upon steam; that the water power was secondary. The claimants contend exactly the reverse. But however that may be, it is a

fact that each of the mills was equipped with a powerful and modern steam plant and depended largely, even though not primarily, upon steam. This being so, the mills have gone along without interruption or inconvenience by reason of the diversion of the water; their business has increased and their profits have grown. However, it has cost, and it will continue to cost, a considerable sum of money to generate steam to replace the diverted water power. The cost has been substantial; and the question is how much has it cost. This is not the only element of damage; the experts have ingeniously invented, and extravagantly magnified, other elements. But the cost of steam to replace the loss of water is the principal element.

The commission has fixed the Diamond Mills damage at $205,000; the Cantine damage at $165,000; the Sheffield damage at $25,000; and the Sands damage at $145,000.

I cannot understand the discrepancy in these awards. The Cantine Company, with a perpetual first right to the waters of the Barclay dam, would seem to me to be injured more than the Diamond Mills, with a subordinate and inferior right. Yet the Diamond Mills is awarded $40,000 more than the Cantine Company. And the Cantine Company, a thriving, going manufactory, using all the power it can get from the Esopus, is awarded $165,000, while the dead property of Sands at the "Deserted Village," owned by a speculator and purchased as a speculation, is said to have been damaged $145,000. To my mind these conclusions of the commission are incongruous.

The commission has written no opinion and has not, therefore, advised the court of the theory on which it proceeded in arriving at these figures; nor of the principles which lie at the basis of its computation; nor of the rules which guided the minds of the commissioners

to an ultimation. Perhaps the law does not make it incumbent upon the commission to do so; the statute, at least, does not specifically require it. But if the commission had set forth its process of reasoning, or had indicated the route by which it reached the figures in its report, this would have been helpful to the court in reviewing the report, and perhaps convincing. The court ought not, of course, to pit its judgment against the judgment of the commission. The commissioners, not the court, are to assess the damage. However, if the awards are arbitrary, then it becomes the duty of the court to exercise its own judgment in determining whether they are reasonable, and whether justice has been done.

It is true that the difference in the value of the property before and after the diversion of the water is the correct rule of damage. 1 Nich. Em. Dom. 435; 2 Lewis Em. Dom. § 464. But how are we to ascertain the difference? Are we to rely simply upon the opinions of experts? Obviously not. Facts, not the purchased opinions of professional witnesses, count with courts. *Roberts* v. *New York E. R. Co.,* 128 N. Y. 455. The naked, arbitrary opinions of men who call themselves " experts " are of little value.

As I have previously observed, it is the exercise of good judgment on the part of the commissioners, in the last analysis, which determines the damage. And in exercising their judgment they get very little help from the experts. The long dissertations of these hired witnesses are almost worthless. This is demonstrated in these very cases by the wide variance in their conclusions. If one expert estimates the damage at $200,000, and another places it at $250,000, and still another fixes it at $300,000, all experts for the same claimant, which of the figures are the commissioners to adopt? How are the commissioners enlightened by

these widely discordant views? They are not enlightened, they are befogged. It must have been perfectly apparent to the commissioners, as it is to the court, that the figures of these pretended experts were merely the wildest guesswork and speculation, furnishing no basis whatever for a judicial determination. The experts were supposed to be there in court to help the commissioners, but with $100,000 difference between them how were the commissioners helped? Which of the experts should the commissioners have followed? What were they to do with this huge variance? " Split the difference " as horse traders do? The disparity of $100,000 in the estimates of these professional witnesses renders their opinions utterly worthless and makes a farce of the part which they acted at the hearing.

And, incidentally, I feel that I ought to say that it is my opinion, generally, that altogether too much time is wasted in these water damage cases with experts. Too much importance is attached to their testimony; too much money wasted on their fees. The commissioners look at a farm, and view the land, and inspect the buildings. On so simple a subject, how can experts assist? What good does it do the commissioners in such a case to have experts testify? It must be repugnant to their common sense, and humiliating to their self-respect, to be forced to listen in each case to the divergent, salaried opinions of these same hired witnesses. The commissioners are fully aware that the claimant's experts will, in each case, overestimate the value; and that the city's experts will, in each case, underestimate it. To sit on the bench and witness the repetition of this comedy, day after day, and maintain a demeanor of seriousness, must tax the histrionic capacity of the commissioners. In the ordinary claim for damages, I believe the

experts are a superfluity. They waste time, consume money, lumber up the record, and befuddle the judgment of the commissioners.

I am fully aware that the expert witnesses employed by the claimants in these cases were men of wide experience. They qualified abundantly. They knew much about mills and machinery and water power and steam power and horse power and utilized power and kilowatt hours and hypothetical development and available development and load factors, etc. Their nomenclature embraces a wide range of learning. No court would wish to belittle their accomplishments. But experts have a knack of juggling with figures and discoursing on hypothetical subjects, thus weaving a maze of difficulties about the point in controversy, until one is led away in bewilderment from the simple, obvious facts surrounding a situation. It is almost dangerous to listen to them. However, it is the habit of courts to tolerate them — a bad habit. But after studying their processes of reasoning in these cases and after giving due weight to all their learning and experience, I cannot help but remain persuaded that a casual observer, if unbefuddled by experts, even one experienced in mills and riparian rights, would never dream of the fabulous damages conjured into reality by the theory and sophistry of these gentlemen.

The awards should be set aside because they are inconsistent, and because they are against sober common sense, and because they are against the overwhelming weight of evidence; or, it would be better to say, against the overwhelming weight of the facts. If the purchased testimony were to be counted in at its face value, counted in with the unbiased evidence, counted in with the simple facts, perhaps the awards might stand. But even then there would be doubt, for the conclusions of the claimants' experts are so widely

variant that they cannot be harmonized and are therefore worthless.

The awards in the three Saugerties claims puzzle me; their magnitude, their inconsistency, their inharmony. But when I come to the Sands claim I am not puzzled — I am staggered. This claimant has a " ledge of rocks " across the Esopus creek constituting a natural dam; that is all he has. He has no right to raise or lower the slack waters held back by this ledge of rocks. He has no mills, no raceways, no industries, no pondage rights — nothing but the naked waters tumbling over the rocks. Before the Civil War a few logs were bolted to the rocks creating a sort of crude dam, and some unpretentious industries were supplied with power and struggled along for a time at Glenerie, and died. But for more than a quarter of a century the place has been stagnant as a graveyard and has been known, the country round, as the " Deserted Village." The dam is gone, the buildings are tumbled down, the waters run to waste. And this is the property which the commission says has been damaged to the extent of $145,000. Nobody but a novelist or an expert would have sufficient imagination to convert these rookeries and ruins into a substantial fortune.

I am impressed with the conviction that these claims should be sent back to other commissions for a new trial and I am about to so order. Therefore I have not undertaken here to construe the quadripartite agreement or to fix the rights of the Saugerties claimants under it. Neither have I undertaken to discuss the many intricate, but mostly superfluous and confusing, questions presented to the commission. At the new trial the commissions should hear and consider all that is brought to their attention, but they should not be prejudiced by anything I have said here. They must

28

be guided by the facts as they are presented before them.

There being enough commissions now in existence I direct that the three Saugerties claims be sent to the Yale Quarry Commission and the Sands claim to Business Damage Commission No. 5.

Ordered accordingly.